Yes, good morning, Your Honor. Becca Walquist on behalf of LabCorp. Thank you. Excuse me for that. I haven't used my voice in about an hour. Oh. And I'd like to reserve five minutes for my reply. I'll try to keep time on the watch. Very well. So, good morning, Your Honors. The Supreme Court in TransUnion v. Ramirez held that all members of a putative damages class must have Article III standing in order for that damages class to be certified. Plaintiffs say that Vargas' injury, the California UNRRA Act plaintiff, and all of the UNRRA Act class members' injury occurred as soon as he walked into the LabCorp PSC and was denied full and equal access to the LabCorp Express Service. But there must be an injury in fact. By certifying a class of every legally blind person in California who walked into a PSC and was unable to use the kiosk, the class includes everyone. It includes blind persons like ACB member John Harden, who prefers to check in at the front desk, has no intention of checking in at a kiosk. The class encompasses blind persons who walk into a PSC with an employee at the front desk and check in immediately. In California... So, I'm reading the class certification. It says all legally blind individuals in California who visit a LabCorp patient service center in California and were denied. You're saying that this certifies anybody who walks in? This says has to be denied. Oh, Your Honor, there was a modification by the district court to the class certification order so that the class that was certified is all legally blind individuals in California who visited a PSC during the class period and who, due to their disability, were unable to use the kiosk. Plaintiffs at page 29 of their brief have described that as the injury of Vargas and all class members occurred as soon as they walked into the PSC and were unable to use the kiosk. And they're eliminating the important thing of an intent. But don't we go by the language used in the certification rather than what they say in their brief? And the language in the certification is that they were unable to use the kiosk. Yes, but there's nothing in the certification order that...the certification order... If you're blind, you're not able to use the kiosk. This is why LabCorp established a check-in at the front desk as well and upgraded the software at the front desk. And 25% of all people going to PSCs check in at the front desk. There's also an online check-in. So the kiosk use is not mandatory. The court includes everyone who cannot use a kiosk, but to have an injury, you would have had to have an intention or a desire to use the kiosk. This court, the Ninth Circuit, in 2018, certified over to the California Supreme Court a question about UNRRA Act damages in regards to white versus square. And that was a bankruptcy attorney who wanted to use Square Inc.'s credit card charging machine and couldn't because he's a bankruptcy attorney, so he said he was being discriminated against. And the Supreme Court was very clear, California Supreme Court, that what you would need to show standing is white did not need to sign up for Square services, but he had to have an intent to use them. The judges had a factual record before him in this case that Mr. Vargas did not intend to use the kiosk when he came for his actual appointment. He had been told he would be checked in at the front desk, and he was. Mr. Hardin says that he does not want to use a kiosk. He wants to check in at the front desk. I think I'm right as to Vargas. He comes early, a day or so ahead. Yes. And then when he comes back, he does use the kiosk, but he's given assistance to do so. No, Your Honor. That's not true? No, that's not true. So what happened? So what happened was he came on the first day and said, I'm going to be coming for a service, and I want to know how I'm going to check in. He was told he would be checked in at the front desk. When he came the next day, he went to the front desk. He waited in a short line. He checked in at the front desk, because there were other people checking at the front desk, and he got his service. He never used the kiosk. He was never directed to use the kiosk. That's very clear in his testimony. We go through all of the record sites in our briefing. But wouldn't it be futile for him to try to use the kiosk? I mean, he's blind. But LabCorp is permitted to have a qualified reader to have a check-in at the desk option. I think the district court judge was very confused because LabCorp's competitor, Quest, has a mandatory kiosk check-in, and there isn't a front desk check-in. And at Quest, if you need help checking in, you do a three-fingered swipe, somebody comes and helps you check in at the kiosk. So that's one thing I was unclear of. What you're indicating is LabCorp did have a check-in at the counter. Yes. In addition to having the kiosk. Exactly. But doesn't it depend on the size of the LabCorp facility as to whether there's an actual person at the desk or if there's someone in the back that's also running the tests and comes out and helps occasionally? Every LabCorp facility has a front desk check-in so that if the person's being checked in by a LabCorp employee, they're being checked in at the front desk. But is there always an employee there? There might be a full-time employee for check-in at some facilities. At other facilities, it depends on the time of day and when the rushes are. Let's assume the time of day is not right. Let's assume that the time of day is not right. A blind person goes in, and they have to wait, and isn't that the injury? They have to wait. They have to figure out, hopefully, that somebody at some point comes out because there's a kiosk there that they can't use. But there's evidence in front of the court, on the record, that this is not the case in many circumstances where people want to check in at the front desk. They get there, and there's someone there at the front desk. I'm not asking when there's someone at the desk. I'm asking when there's not. If there's not someone at the desk, you're not going to be helped any sooner than when the person can come check you in and then take you back. So if you're at a very small center, there's one phlebotomist. That phlebotomist is in the back helping someone for a blood draw, which takes three, four, five minutes. Then anybody who walks in at that point is going to have to wait for the phlebotomist to come back to the front. But at LabCorp, there is a front desk check-in, and it's not people that are just waiting in the back to be summoned. That's what happens at Quest. And we believe our judge got confused because the Quest decision had come out earlier. But in the small facility that you just described, say two people who were sighted came in, and they each checked in in the kiosk, and the blind person is still waiting for the person at the desk to check them in. The person hasn't come back yet from doing their blood draw. Don't they end up being third in line instead of first in line because they got there first? No, this is all hypothetical. I mean, the plaintiffs said that in their complaint, but there's no actual evidence in the record of anything like that happening. Well, if that's what happened, though, if that's what they're alleging, though, isn't that what is sufficient? If we define that the service that's being at issue is not being able to get checked in, right, not being able to get signed in to receive ultimately the blood draw, that's the service. Isn't that the service that's being offered here? We say the service that's being offered is medical testing, and there's no one that is saying they're not getting medical testing. The argument that it's a service, a standalone service that somebody who comes to LabCorp PSC to use, that you have a service because you have an independent check-in facility, you have one option for checking in, but you can check in online before you get to the center, which Mr. Vargas does, I'm sorry, Mr. Davis. You can check in at a front desk, and if you're in an incident where there's nobody at the front desk, you know, you're going, the presumption that you're losing a place in line is nothing that is in the record, because Mr. Vargas did not lose a place in line. He's the only California plaintiff they have any testimony from. But isn't that the harm that they're alleging, that they lose their place in line? But they don't have anyone alleging that harm. So the Ninth Circuit and Chapman recognize that if there's a violation of the ADA, it doesn't require a person with a disability to actually engage in a futile gesture. Yes. And wouldn't it be a futile gesture to require the blind person to go and try to use the kiosk when you know that they can't use the kiosk? Well, you don't need a futile gesture, but you do need an intent and a desire to use the kiosk to check in. There's so many people that do not want to check in with the kiosk because it involves swiping your own cards and your own information. The reason there's 25% check-ins, 2.5 million out of the 10 million California check-ins over a three-year period would have been done at the front desk. It's because for a wide variety of reasons, people want that assistance, and that qualified reader is what LabCorp has offered. And we're sitting here at class certification stage, and there's hypotheticals throwing around, but there's no evidence, there's no expert reports, there's no observations of centers saying, here's what happened and here's a record that we can show you, Your Honor. Instead, it was Mr. Vargas who went and was helped and then went back and was helped and has no allegations that he lost his place in line or anything, and that's the record that was in front of the court when it certified at class, based on a presumption that there could be instances, as Your Honors are seeing, where there could be an issue. But that's not how you can certify a damages 23B3 class, because the evidence is that front desk check-in is the preferred alternative for checking in by the ACB, by people like Mr. Hardin, and by a number of, I mean, a good percentage of LabCorp visitors. LabCorp could have done what Quest did, could have pulled out its front desk check-in and had a mandatory kiosk check-in and didn't. Its policy and thinking about the fact that blind people would not be able to use the kiosk was to enhance and improve its front desk and check-in to have all the same capabilities that they were putting into the kiosk and then keep both means of check-in. But isn't there a different type of kiosk available that blind people are able to use and that LabCorp chose not to use that type of kiosk? Not all blind people can use kiosks that have those kinds of technologies. And so if you went with a kiosk that had, like, a headphone jack, and there were business reasons that LabCorp did not want to go with a kiosk that could be manipulated by people and so forth, if you went with something that had some of those additional features, you would still have the issue that there are going to be blind people that cannot use a touchscreen kiosk to check in and who are not comfortable with the software reading technologies that Plaintiff Bargus and Plaintiff Davis want to use. But is the record clear that there is technology available that will make the kiosk available to blind people that are not able to use the LabCorp check-in? There's testimony from Plaintiff's expert that there could be improvements made to the kiosk that would make it more accessible to some. But the thing with these self-service kiosks is there hasn't been a rule. The Federal Access Board, which does the ADA guidelines, is actually in the midst of doing a rulemaking, and it's expected this month to come out. Let me ask you this before your time runs entirely. So far you've been focusing on Mr. Vargas and on the California class. What about Mr. Vargas and Mr. Davis with respect to the nationwide class? Because Mr. Davis is in a different situation. Yes, well, Mr. Davis actually has no need for an injunctive class. He's not typical because he checks in online. He's been checking in online since 2019, so he has no intention of using a kiosk. I did not see my time was going. I think I need to reserve the rest of my time. I bet you'll be given more time if I take it by this question. So I understand that Mr. Davis is now checking in online. Does he have a damages class action for the time that he was not able to do so? He's not a California resident, so he's not part of the damages class. So there's no damages class action with respect to the nationwide? Yes, so the nationwide class is the injunctive ADA class. So the nationwide is injunction only. Yes. All right. Thank you. Thank you. And I'll make sure I give you two minutes. Go ahead, counsel. Thank you, Your Honors. Good morning. Benjamin Sweet on behalf of the certified class. May it please the court. I want to start with the court's questions about what the service is at issue in this litigation. And I think the crucial fact here with regard to what the service is, is that LabCorp applied for a federal service mark for LabCorp Express, which is its kiosk-based communication system. And that kiosk-based communication system does a whole lot more than just check patients in. It offers a number of different services, including the ability to wait outside during COVID-19, the ability to change the demographic information. But they're saying that the service, the ultimate service here, is the drawing of the blood, the medical service. That's what they're indicating, that the service is not this additional perk, if you will, of using this kiosk. We disagree, Your Honor. We think that when they registered for the federal service mark, then they were basically locked into that being a service. And, you know, beyond that, as I mentioned, there are a number of things that you can do at the kiosk that blind patients for the duration of this period of time were not able to do and are not able to do today. It's a situation where, you know, she talked about the Quest litigation, and I think that's an important thing to reference, the Quest diagnostics and what they're doing. And in the Quest case, what happened was we had a four-year litigation. We ultimately had a class action trial in that case. Plaintiffs prevailed at that trial because they proved that Quest had not done enough to provide effective communication across its PSCs, and there were 2,100 of them. And in that particular case, Quest had done something. It had provided something called three-finger swipe, which was a gesture that the blind folks could use at the kiosk to allow them to check in and be serviced by folks at Quest. That was started in 2020. We proved during the course of that litigation that what they did with respect to three-finger swipe was ultimately ineffective, but it was something. What makes this case so remarkable and makes it stand out among other effective communication cases is that here LabCorp did absolutely nothing to provide blind patients. But the problem, as I understand it from the other side, is two pieces, but they're more or less amounting to the same thing. You've got a plaintiff, Mr. Vargas, who maybe is not representative of the class of people who cannot use the services or want to use the services you say are not available and that the class certification is too broad. How do you respond to that? Well, I disagree with that, Your Honor. Yeah, I thought you might. So help me out as to the nature of your disagreement. Sure. Mr. Vargas came in, as you mentioned during your questioning of opposing counsel, Your Honor, Mr. Vargas came early. And he comes early because he wants to make sure that because he's going to be taking paratransportation and he's going to be fasting, that he's not going to have any issues getting checked in. And he learns that he has absolutely no access to this new service. And by the way, the federal service mark for LabCorp Express appears on all of its kiosks. It's a new service that they very much brag about. And to the point that it's not a distinct service, Your Honor. I think this is very important to this point that they're not a distinct service. LabCorp says now during a litigation posture that patients don't come in and seek to use the kiosk for any reason. But in their 2018. . . So wait a minute. You veered off here. So what happens to Mr. Vargas when he comes back? When he comes back, he has to wait in line. We don't know whether someone else was there, to Judge Schreier's question, came in, was able to use the kiosk and check in. Did he use the kiosk? I was just told that he did not. He was not able to use the kiosk. He was not able to use the kiosk or any of the services within the kiosk. Did he ask to use this? Did he indicate that he wanted to use the kiosk? He indicated that he wanted to use the kiosk on his initial visit and was told he could not. And he had to be checked in by LabCorp personnel. So the first visit, it's uncontested that he said, I would like to use the kiosk? That's correct. And then he comes back knowing that he can't use it? That's correct. And there was some, because this is not just 12B-6, but rather class certification, is there evidence in the record to support what you just said? Yes, there is, Your Honor. Okay. With respect to this question of what is the service and are these folks able to, quote, unquote, check in, Your Honor has asked a question about what happens in the case where there's only one LabCorp personnel in the location. And I think counsel might be a little bit off on their understanding of the facts because what the record facts show during the 30B-6 deposition of LabCorp's representative is that at 448 locations across the country, 448 locations, there is only one employee working at any given time. That employee is always a phlebotomist who's in the back, and that employee is not available to check patients in. And 66 of those locations are in the state of California, and they have no defense for that. That's an undisputed fact in the record. There's no defense for it. They haven't put any record facts in to suggest that that's not in any way accurate. So I think that's a big problem for them in terms of their theory. When it comes to Mr. Davis, Mr. Davis went not once, not twice, but three times. He went to the LabCorp location and was told in each case, you have to go back and use this inaccessible kiosk. He was redirected. And the district court found that there was facts put forward to suggest in the record and held it in the class certification opinion that folks were routinely told that the use of the kiosk was mandatory. So if you're legally blind and you come to Quest, that is what you're being told. That's what the record is. That you're being told you have to use this inaccessible kiosk to check into the location. So is the injury that's suffered primarily one of dignity? I think that the injury that is suffered is an inability to use a distinct service, all of the features of the service of LabCorp Express. And obviously this court has said in multiple cases, Doran v. 7-11 and the Pier 1 case that you referenced before, that disability discrimination in and of itself is a concrete injury under Article 3. That's something this court has said and the Supreme Court has said. I think according to your theory, if LabCorp had decided not to use this check-in device at all and sent everybody to the desk, there's no violation? I think that if at the time, well, let's go back and look. Again, that's a yes or no question. Yes, John, I think that's probably correct because before the time that the kiosks were introduced, everyone was subject to a paper and pen check-in system. You would walk in, we all remember. And my question is, if that was the only thing offered, would that then be a violation? I don't believe that would be a violation. So they produced the violation by introducing a mechanism for checking in that's not equally accessible? They introduced a separate service that has a number of features, and one of those features was checking in. That's correct. And, you know, Ms. Walquist talks about this 25%. Do you have to show that any of your named plaintiffs wanted to use these extra services? As far as I can tell, Mr. Margus and Mr. Davis, the only thing they wanted was to check in. Well, I think the law, in terms of whether you have to show that they had an intent to use the services, falls under White v. Square, and I think the language of White v. Square is important. You have to have an intent to use services. Well, but my question is more specific. Yes. There are a lot of services that are available on this machine. Yes. As far as I can tell, the only service the two named plaintiffs wanted was to check in. And you're saying, but there are other services that are not equally available, that are not available, and so on. Do you have to have somebody who wanted to use those services? The answer is no, Your Honor, and the reason is that that would be penalizing someone who's blind, who might not even know. I understand someone, but do you have to have someone as a plaintiff who might have wanted to use those? Well, what we do in this case, the record testimony for these folks, what they testified at deposition is that they would have liked to use all of the additional services. What I'm saying is we can't penalize class members for not knowing about services on the basis of their own disability because the defendant didn't provide effective communication. So you've got testimony in the record that they wanted more than just checking in? That's correct, Your Honor. It's in their deposition testimony. I'd like to, if I could, just speak for a minute about the question of predominance, Your Honors, if that's okay. And when I dive into that, I want to talk about the legal standard on appeal from predominance findings, which this Court said last year and only in wholesale grocery is of critical importance. And here, there are a number of factual findings that were made by the district court in predominance, and those, with regard to the factual findings, are subject to a clear error standard. And I haven't heard anywhere in their predominance arguments that LabCorp has said that those factual findings were an error. And so that argument with regard to predominance doesn't really get off first base. We talk a little bit about the fact that this is a unique situation with LabCorp, in that most companies in this situation are going to try and do something to provide those patients with effective communication. But what makes this case stand out is that LabCorp just elected to do absolutely nothing, did absolutely nothing in 2016, and does absolutely nothing today. And so we've just asked the Court to take a look at that. We think that the service mark protection is critical. It's critically important. It's hard for us to understand how LabCorp can take a position that, you know, on one side of its mouth, it's saying we want federal service mark protection. Out of the other side of its mouth, it's saying this is not a distinct service. Well, it has to be a distinct service to earn federal service mark protection. That's a big problem for them, and I don't know how they resolve that question. Now, they're asking this Court to step in and say this isn't a service. The district court didn't even say it isn't a service or is a service. It didn't resolve that question. It simply said that it is a common question, one of six, that a court is going to ultimately have to determine that that will drive the outcome of the litigation. So it wasn't, as Judge Fletcher said a moment ago, this wasn't a merits discussion. They were just framing the issue of what the important issues are that will drive the outcome of the litigation. And so what LabCorp is essentially asking this Court to do is to jump in and make a merits determination on whether or not LabCorp Express is a distinct service. And we think that's inappropriate, and they've cited no authority to suggest that that's an appropriate inquiry at this point in time. I'd like to ask you a question about your nationwide injunctive class. Sure. In your brief, you allege that a uniform injunction would provide relief to all class members, but you don't identify what the terms of the injunction would be. And your expert gives an opinion that each blind person may have different accessibility needs. So what injunction could provide relief to all of the class members nationwide? That's an important question, and thank you for it. It isn't like we have to hunt around and look at what would be an acceptable solution. Our expert said there is an accessible solution that will effectively address every single blind person's issues. But there are already regulations around ATMs, for example, that make them fully accessible, and that's the law of the land right now. And as counsel pointed out, there are rules that are being in the rules-making process right now that will eventually come out that will guarantee that all of these machines are operating under a standard and are made accessible. So it's a solution that's easy to provide. It's not even difficult for a court to write an injunction that would turn these machines from inaccessible to accessible. You're talking about audio output. You're talking about a tactile keypad. These are very basic items that are included in most machines that are accessible. I want to talk just briefly, if I could, about the question of superiority as well, Your Honors. We agree with LabCorp that some clarification is required on the superiority element and that it's warranted. LabCorp challenges only one of the four factors under superiority. That's manageability. But this court noted in Bresenio that courts should not refuse to certify a class merely on the basis of manageability concerns. So if that's their only challenge, they're sort of out of court on that. But beyond that, they seem to be taking issue with the $4,000 UNRRA Act minimum statutory damages penalty and whether that's enough to motivate a plaintiff. And this court said in Wolin that it was not. Every district court other than the Quest Court to address that question has said the same thing, including that amounts as much as $8,800 are not enough to motivate a plaintiff in light of the cost of litigating a case. And so we think it's important that this court, in this case, sort of come down and let us know what the rules of the road are with regard to superiority and at what point a minimum statutory damages award does motivate a plaintiff to engage in litigation. With respect to the costs, this test looks into what the costs of the case are. In the Quest case, the costs were over $330,000. That's a matter of public record. And so Mr. Vargas, you know, the $4,000 minimum statutory damages award that he would seek and he would ultimately be awarded here, is that enough to motivate him? I think that's highly questionable, but we think the court needs to weigh in on that particular point. And finally, with respect, because I see my time is winding down here, there was some discussion in the briefing. So I wanted to just briefly address that there was a misrepresentation of some of the facts. And so I wanted to provide for the court a response to that because there was no misrepresentation of facts, although there was a little bit of an issue with pinpoint sites. So I just wanted to lay out in response to on reply brief, page 13, there are four bullet points, and each one we actually have appeal record citations to. Those arguments were based in fact. So with regard to point one, that would be appeal record citation ER-682-685. With point two, it would be appeal record citation SER-29-30. Point three would be ER-1277-1278. And the fourth point on page 13 of the reply brief was LabCorp's own website. So I just wanted to make those points because we didn't want to be misrepresenting anything on the record to the court. Just one second. I don't know if any other judges have any questions. Thank you very much. Thank you very much. Ms. Walquist. Thank you. So, Your Honors, Judge Olguin certified a damages class without looking at transunion, the requirements of transunion, without looking at... Transunion talks about post-trial counsel. We're at the class stage. Olguin, after transunion, said that following transunion, it is part of a 23 analysis for a district court judge to look at whether individualized inquiries would overwhelm common questions. And it's not a solution to wait until after trial to then let uninjured people just fall out of a class. I do want to comment on this trademark application that plaintiffs have been discussing about how it makes the kiosk a separate service. If you look at the trademark application, which is 5ER-1004, the application was for software for patients to check in for laboratory diagnostic testing clinics. That is the software that was put into the kiosk but also put into the front desk check-in. So that software... The kiosk was not designated as a service. The software was trademarked, and the software is available in both places. But, yes, I think Judge Gee's recent order after trial in the Quest case is very interesting because she looked at Mr. Vargas' visits and found an UNRRA Act violation for one but not for the other in his visit with Quest because it's an individualized inquiry, what happened during that visit. Plaintiff told you that there are 66 locations in California out of 300 where there's one phlebotomist. But that means that there's 234 locations where there's more than one PSC employee. And these kinds of factual differences... And there's locations where there's full-time receptionists. And to certify a class of every legally blind person who went to one of 300 PSC locations during a five-year period, especially on the damages front where you have people like Mr. Hardin who didn't even want to use a kiosk but would be entitled to statutory damages. I mean, he goes every three months, and so he would have $80,000 of statutory damages himself as somebody who likes to and wants to continue to check in at the front desk. It's just not a certifiable damages class here. And on the injunctive front, it's not... But haven't the district courts split on whether $4,000 is a substantial damage amount? Yes, and we agree with, of course, the courts that find that it is substantial. So if we apply an abuse of discretion standard, how can we find that the district court abused their discretion when there's a split? On the superiority? On the $4,000 damage, substantial damage amount. Oh, on that one issue, I think that because it's a question of law on whether or not it's substantial or not, that you can look at that question de novo. I don't think that that's a record question that would need an abuse of discretion standard on that one point. Thank you, counsel. Let me see if there are any other follow-ups or questions. All right, thank you very much. Thank you.  This matter will be submitted.
judges: FLETCHER, MENDOZA, Schreier